OPINION
{¶ 1} Appellants, Susan Carpenter and Charles Gang, appeal a decision of the Clermont County Court of Common Pleas, Juvenile Division, awarding permanent custody of their two children to appellee, Clermont County Department of Job and Family Services (CCDJFS).
 {¶ 2} Carpenter and Gang have lived together for the past eight years, and are the biological parents of two children, Jack and Samantha. At the time of the permanent custody hearing, the children were five and two years old.
 {¶ 3} Carpenter and Gang began seeing psychiatrist Dr. Bernard DeSilva in late 1997 or 1998. DeSilva diagnosed Carpenter as bipolar with manic depressive episodes. He diagnosed Gang as bipolar and with Attention Deficit Hyperactivity Disorder (ADHD). Dr. DeSilva's treatment of Carpenter and Gang was mainly working to control mood swings, along with the anger that sometimes accompanied the mood swings, to stay focused on topics or subjects, and working on the ability to perform a spectrum of everyday human functions. He described the two as "totally disabled" when they first began to see him and stated that he had concerns regarding their ability to parent in the beginning. DeSilva's treatment involved both parents taking several medications daily, along with regular counseling sessions.
 {¶ 4} During their treatment with DeSilva, Gang and Carpenter began to report having problems with Jack. According to the parents, Jack was uncontrollable and would not listen at all. They reported that he had fits, screamed and did not respond to discipline. They told DeSilva that Jack seemed to be in a trance-like state, and that they had discovered Jack standing over their bed with a knife. They asked DeSilva to begin treating Jack so that they could control him.
 {¶ 5} DeSilva testified that from his counseling sessions with the parents, he observed "something was wrong with Jack." He stated that he saw the child showing intense anger, hatred, dislike, kicking and pulling on things, acting aggressively and hitting his parents. He described Jack having an hallucination in his office where the child said there were bugs on the floor.
 {¶ 6} Dr. DeSilva determined that Jack had ADHD and could be suffering from bipolar depression. He began treating Jack with several different medications. He stated that initially he saw some improvement, but that Jack's unmanageable behavior returned.
 {¶ 7} Carpenter and Gang sought parenting help from CCDJFS in 2001 because of their inability to deal with Jack's behavioral problems. Caseworker Enise Grooms testified that CCDJFS prepared a case plan that involved keeping the children in the Carpenter/Gang home. The case plan called for parenting classes and counseling for the family. According to Grooms, the parents were sporadic in their attendance and the services were eventually stopped at the request of the parents. She stated that when Carpenter and Gang were attending classes and counseling as required by the case plan, there was no evidence they were learning new skills or following the recommendations they received. She described the parents as "very resistant" when they were attending classes.
 {¶ 8} Grooms testified that she had frequent contact with the family, and every time she talked to Gang, without exception, he would tell her how horrible Jack was. In January 2001, Gang contacted Grooms several times stating that he could not handle Jack, "something had to change," "somebody has to come and take this kid, we have to get rid of him" and that Jack "had to go."
 {¶ 9} Grooms arranged for Regina Davis, a foster parent who has custody of Gang's other children, to care for Jack for a three-day emergency period. At Gang's request, Davis continued to keep Jack for an extended period of time. When Davis discovered Jack acting out sexually, the child stated that he had been sexually abused by Gang. Samantha was removed from the Gang/ Carpenter home as a result of the allegations. At a hearing on February 22, 2001, the parents stipulated to a finding that the children were dependent, and temporary custody of both children was awarded to CCDJFS.
 {¶ 10} The family case plan was amended to include reunification as a goal and to include visitation for the parents. Parenting classes and counseling, including counseling with Child Focus for the parents and Jack, were included in the case plan. Dr. Larry Graham interviewed the parents and Jack on behalf of Child Focus and reported issues of concern in a letter to Dr. DeSilva. Dr. Graham expressed concern with the ability of Carpenter and Gang to parent their children. According to Graham, the parents admitted that they spoiled Jack and did not set limits on his behavior because they were "disabled." Dr. Graham reported that "[a]s a rather dramatic example of that situation, Jack does not like getting his hair washed. At times the parents reported that they have gone literally six months between washings rather than deal with the battle that ensues around the bathtub issue."
 {¶ 11} Dr. Graham stated that most of his concern at his initial meeting with the parents was related to "the parents viewing themselves as disabled and ineffective and given their limited cognitive abilities and their past poor experiences with parenting that they would not be able to provide the structure that a child with Jack's problems require." Dr. Graham's letter also expressed concern that, while he was on vacation, the parents reported to another doctor that they had overmedicated Jack with a potentially lethal dose of medication in an effort to get him to sleep and deal with his behavioral problems.
 {¶ 12} The caseworker, Enise Grooms, testified that she began seeing improvement in Jack when he was removed from the home in January 2001. By April 2001, Jack was completely removed from all of his medication. According to the foster mother, Jack is a wonderful child who is well-behaved and helpful with the other children in the home. She stated that Jack is a peaceful child without anger or rages. She reported that the children were both dirty when they arrived and refused to accept affection, but are now cleaner and accept hugs and kisses from the foster parents. According to Grooms and the foster mother, Samantha had episodes of tremors where her body shook. These "tremors" ended while she was in foster care, except on visits with the parents. Grooms testified that she felt these tremors were a bodily response to the stressful environment created by the parents.
 {¶ 13} As part of the case plan, Carpenter, Gang and Jack were evaluated by Dr. Joseph Cresci, a child and adolescent psychiatrist. Dr. Cresci's conclusions regarding the family differed greatly from that of Dr. DeSilva. While Dr. Cresci agreed that Carpenter suffers from a bipolar disorder, he found no evidence of this disorder in Gang. Instead, he determined that Gang has a low-level, borderline psychotic personality disorder that is not treatable. He determined that neither parent has the capacity to take care of, raise, or meet the cognitive social needs of the children. Dr. Cresci found that Jack's behavior problems were the result of living in a stressful environment and that his behavior changed when moved to the foster home because he went out of the stressful environment into one that was nurturing, caring and supportive.
 {¶ 14} Following Dr. Cresci's evaluation, CCDJFS requested permanent custody of the children. A magistrate heard evidence on November 16 and December 7, 2001, and issued a written decision granting permanent custody of both children to CCDJFS on January 18, 2002. Both Carpenter and Gang filed objections to the magistrate's decision. After a hearing on the matter, the trial court overruled the objections. In individual appeals, Carpenter and Gang each appeal the trial court's decision to grant permanent custody of their children to CCDJFS.
 {¶ 15} Carpenter's single assignment of error and Gang's first and second assignments of error involve the trial court's determination that granting permanent custody to the CCDJFS is in the best interest of the children and that the children can not be placed or should not be placed with either parent.
 {¶ 16} We begin by recognizing that natural parents have a constitutionally protected liberty interest in the care and custody of their children. Santosky v. Kramer (1982), 455 U.S. 745, 102 S.Ct. 1388. A motion by the state to terminate parental rights "seeks not merely to infringe that fundamental liberty interest, but to end it." Id. at 759. In order to satisfy due process, the state is required to prove by clear and convincing evidence that the statutory standards have been met. Id. at 769. "Clear and convincing evidence" requires that the proof "produced in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 17} A reviewing court will not reverse a finding by a trial court that the evidence was clear and convincing unless there is a sufficient conflict in the evidence presented. Id. at 479. When deciding a permanent custody case, the trial court is required to make specific statutory findings; the reviewing court must determine whether the trial court either followed the statutory factors in making its decision or abused its discretion by deviating from the statutory factors. See In reWilliam S. (1996), 75 Ohio St.3d 95.
 {¶ 18} A trial court may not award permanent custody of a child to a state agency unless the agency satisfies two statutory factors. First, the agency must demonstrate that an award of permanent custody is in the best interest of the child. R.C. 2151.414(B)(2). Second, the agency must show that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent. Id.
 {¶ 19} Both Gang and Carpenter dispute the trial court's finding that it is in the best interest of the children to award permanent custody to CCDJFS. As mentioned above, the agency must demonstrate that "it is in the best interest of the child to permanently terminate parental rights and grant permanent custody to the agency that filed the motion." R.C. 2151.414(A)(1). In making this best interest determination, the trial court must consider all relevant factors, including but not limited to the following factors enumerated in R.C.2151.414(D):
 {¶ 20} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 21} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 22} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 23} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 24} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 25} The trial court found that the children need the kind of legally secure placement that a grant of permanent custody to the agency would facilitate. The record supports this determination. The evidence shows that the children are doing extremely well in foster care, and that the foster parents want to adopt them. Except for the parents and Dr. DeSilva, all of the witnesses who had contact with Jack stated that the change in Jack was remarkable and that he is a wonderful and well-behaved child now that he is in a secure environment. The guardian ad litem also found that the children were thriving in the loving and supportive environment of the foster parents and that it is in the best interest of the children to remain in this healthy and functional environment.
 {¶ 26} Although the parents argue that testimony showed that they had a bond with the children and that the children were never physically abused or deprived of necessities, such a finding does not necessarily mean that it would be in the children's best interest to remain with their parents. The record shows by clear and convincing evidence that the children are thriving in an emotionally secure environment, without the problems the children exhibited when they were living with Gang and Carpenter.
 {¶ 27} The parents also argue that the trial court erred by finding that the children cannot be placed with the parents within a reasonable time or should not be placed with either parent. With respect to the determination of whether a child cannot be placed with either parent within a reasonable time, or should not be placed with his parents, the factors to be considered pursuant to R.C. 2151.414(E) include the following:
 {¶ 28} "* * *
 {¶ 29} "(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *."
 {¶ 30} Much of the parents' argument on this issue (and on the best interest issue) centers around the testimony of Dr. DeSilva as compared against the testimony of Dr. Cresci. Dr. DeSilva stated that Gang and Carpenter are now able to parent the children. He advocated returning Samantha immediately and gradually re-introducing Jack back into the home. Dr. Cresci, on the other hand, found that neither parent was able to effectively meet the children's needs and that the stressful, insecure environment was harmful. Both parents argue that DeSilva's testimony should have been believed because he has been treating the family for several years while Dr. Cresci only evaluated the family for a few hours.
 {¶ 31} However, a review of the evidence as a whole demonstrates two drastically divergent views regarding the facts of the case. Dr. DeSilva and the parents presented evidence that Jack is an uncontrollable child with severe behavioral problems that are a result of mental illness and that the parents did the best they could. DeSilva stated that he does not believe the reports that Jack is a well-behaved, loving child and that any improvement was "staged." DeSilva even indicated that Jack was "coached" in his behavior during a visit that he observed. His testimony reveals that he feels the parents did all that they could and are the victims of a conspiracy to take the children away.
 {¶ 32} On the other hand, the testimony and evidence of Dr. Cresci, the foster mother, the caseworker, Dr. Graham and the guardian ad litem presented a picture of two parents who are unable to recognize and deal with normal childhood behavior and to effectively meet the emotional needs of their children due to their mental illness. This evidence presents the children's stressful environment as the cause of their problems and that once removed from the home, the children are thriving.
 {¶ 33} Although there was a conflict between the medical opinions of Drs. DeSilva and Cresci, Dr. Cresci's opinion was overwhelmingly supported by the other evidence of record. Given that the trial court was in the best position to view the witnesses and determine credibility, we find that the trial court did not err in determining that there is clear and convincing evidence that the children cannot be placed with the parents in a reasonable time or should not be placed with either parent.
 {¶ 34} Because we find the trial court did not err in determining that permanent custody of the children should be granted to CCDJFS, appellant Gang's first and second assignments of error are overruled. Likewise, appellant Carpenter's single assignment of error is overruled.
 {¶ 35} In his third assignment of error, Gang contends that the trial court's decision should be reversed because the court failed to comply with the mandates of R.C. 2151.413(E) and R.C. 2151.353. These provisions discuss the filing of case plans and adoption plans.
 {¶ 36} Pursuant to R.C. 2151.353(D), when a trial court makes an adjudication that a child is abused, neglected, or dependent, "[a]s part of its dispositional order, the court shall journalize a case plan for the child." Gang contends that the trial court failed to journalize case plans in several instances.
 {¶ 37} Although the trial court record does not include the case plans, CCDJFS filed a motion to supplement the record on appeal to include case plans that were filed below but not included in the journal or appellate file. Counsel for both appellants agreed to this supplementation of the record and this court granted the motion. These additional records contain time-stamped case plans filed at the time Jack and Samantha were removed from their parents' home, and a joint case plan was also filed with the motion for change of custody. These records also include a time-stamped case plan dated April 24, 2001 from a semi-annual review and various other case plans.
 {¶ 38} Furthermore, Gang has not alleged that he was prejudiced by any failure to file case plans as required. See In re Newsom Children
(Oct. 23, 2000), Stark App. No. 2000CA00073. Thus, we find no merit to this argument on appeal.
 {¶ 39} Gang also alleges that the trial court failed to file an adoption plan before permanent custody was granted. However, this court and other appellate courts have held that an agency is not required to file an adoption plan before permanent custody is granted. In re Gordon, Trumbull App. No. 2002-T-0073, 2002-Ohio-4959; In re Theaderman (Jan. 18, 2002), Brown App. No. CA2001-04-003; In re Cavender (Mar. 19, 2001), Madison App. No. CA2000-06-037. Thus, we find no merit to this argument. Appellant Gang's third assignment of error is overruled.
Judgment affirmed.
WALSH, P.J., and POWELL, J., concur.